Slip Op. 21-117

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| UNICATCH INDUSTRIAL CO., LTD AND TC INTERNATIONAL, INC., | |
| Plaintiff, | |
| PRIMESOURCE BUILDING PRODUCTS, INC., | |
| Plaintiff-Intervenor, | |
| and | |
| ROMP COIL NAILS INDUSTRIES INC., | Before: Mark A. Barnett, Chief Judge |
| Consolidated-Plaintiff, | Consol. Court No. 20-00079 |
| v. | |
| UNITED STATES, | |
| Defendant, | |
| and | |
| MID CONTINENT STEEL & WIRE, INC., | |
| Defendant-Intervenor. | |

## <u>OPINION AND ORDER</u>

[Sustaining the U.S. Department of Commerce's third administrative review of the antidumping duty order on certain steel nails from Taiwan, denying Consolidated Plaintiff's motion for a preliminary injunction, construed as a motion to amend the statutory injunction, and granting Defendant's motion to dismiss count two of Consolidated Plaintiff's complaint.]

Consol. Court No. 20-00079                                    Page 2

Dated: September 14, 2021

Ned H. Marshak, Max F. Schutzman, Dharmendra N. Choudhary, Andrew T. Schutz, and Eve Q. Wang, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of New York, NY, for Plaintiffs Unicatch Industrial Co., Ltd. and TC International, Inc. Kelly A. Slater, Edmund W. Sim, and Jay Y. Nee, Appleton Luff Pte Ltd, of Washington, DC, for Consolidated Plaintiff Romp Coil Nails Industries Inc.

Jeffrey S. Grimson, Jill A. Cramer, Bryan P. Cenko, Mowry & Grimson, PLLC, of Washington, DC, for Plaintiff-Intervenor PrimeSource Building Products, Inc.

Sosun Bae, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant United States.  With her on the brief were Brian M. Boynton, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director.  Of counsel on the brief was Vania Wang, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

Adam H. Gordon, Jennifer M. Smith, Ping Gong, and Lauren Fraid, The Bristol Group PLLC, of Washington, DC, for Defendant-Intervenor Mid Continent Steel & Wire, Inc.

Barnett, Chief Judge: This consolidated action is before the court on three motions for judgment on the agency record pursuant to U.S. Court of International Trade ("CIT") Rule 56.2 challenging the final results of the U.S. Department of Commerce's ("Commerce" or "the agency") third administrative review ("AR3") of the antidumping duty order on certain steel nails from Taiwan.  *See Certain Steel Nails from Taiwan*, 85 Fed. Reg. 14,635 (Dep't Commerce Mar. 13, 2020) (final results of antidumping duty admin. review; 2017-2018) ("*Final Results*"), ECF No. 29-4, and accompanying Issues and Decision Mem., A-583-854 (Mar. 9, 2020) ("I&D Mem."), ECF

No. 29-5;[1] *see also* Confidential Pls.' Mot. for J. on the Agency R., ECF No. 37; Rule

56.2 Mot. for J. Upon the Agency R. on Behalf of Consol. Pl. Romp Coil Nails Indus.

Inc., ECF No. 35; Rule 56.2 Mot. for J. on the Agency R. of Pl.-Int. PrimeSource

Building Prods., Inc., ECF No. 41.

    With respect to the Rule 56.2 motions, Plaintiff Unicatch Industrial Co., Ltd.

("Unicatch"), a Taiwanese producer of subject steel nails and mandatory respondent in

the review, challenges Commerce's decision to calculate normal value based on home

market sales prices; Commerce's exclusion of antidumping duty deposits ("ADD

deposits") from the freight revenue cap; and Commerce's disregard of certain

transactions involving an affiliated supplier and corresponding adjustment to Unicatch's

total cost of manufacturing ("TOTCOM").  Mem. of Law in Supp. of Pls.' Mot. for J. on

the Agency R. ("Pls.' Mem.") at 7–34, ECF No. 37; *see also* Confidential Pls.' Reply to

Def. and Def.-Ints. Resp. to Pls.' Mot. for J. on the Agency R. ("Pls.' Reply"), ECF No.

46.[2]  Consolidated Plaintiff Romp Coil Nails Industries Inc. ("Romp"), a Taiwanese

producer and exporter of subject merchandise that received the "all-others" rate,

challenges Commerce's reliance on Unicatch's above-cost home market sales to

---

[1] The administrative record is divided into a Public Administrative Record ("PR"), ECF
No. 29-2, and a Confidential Administrative Record ("CR"), ECF No. 29-3.  Plaintiff
submitted joint appendices containing record documents cited in Parties' briefs and
additional documents upon the court's request.  *See* Pub. J.A., ECF No. 50;
Confidential J.A. ("CJA"), ECF No. 49; Confidential Pl.'s Resp. to Court's Req. for Add'l
Docs. ("Suppl. CJA"), ECF No. 51; Pub. Pl.'s Resp. to Court Req. for Add'l Docs., ECF
No. 52.  The court references the confidential version of the relevant record documents
unless otherwise specified.
[2] Unicatch is joined by its affiliated U.S. reseller, TC International, Inc. ("TC
International").  *See* Pls.' Mem. at 1; Compl. ¶ 3, ECF No. 10.

calculate constructed value profit ("CV profit").  Mem. in Supp. of Consol. Pl. Romp Coil

Nails Indus. Inc. Rule 56.2 Mot. for J. Upon the Agency R. ("Consol. Pl.'s Mem.") at 4–6,

ECF No. 36; *see also* Letter to the Ct. (May 7, 2021), ECF No. 45 (Romp's letter in lieu

of a reply).  Plaintiff-Intervenor PrimeSource Building Products, Inc. ("PrimeSource")[3]

adopts by incorporation Unicatch's and Romp's respective arguments.  Mem. of P&A in

Supp. of Rule 56.2 Mot. for J. on the Agency R. of Pl.-Int. PrimeSource Building Prods.,

Inc. at 5–6, ECF No. 41-1; Reply Br. of Pl.-Int. [PrimeSource] in Supp. of Rule 56.2 Mot.

for J. on the Agency R. at 2–3, ECF No. 48.

      Defendant United States ("the Government") and Defendant-Intervenor Mid

Continent Steel & Wire, Inc. ("Mid Continent"), the petitioner in the underlying

proceeding, urge the court to sustain the *Final Results*.  Def.'s Resp. to Pls.' and

Consol. Pl.'s Mots. for J. Upon the Agency R. ("Def.'s Resp."), ECF No. 43; Def.-Int. Mid

Continent Steel & Wire, Inc.'s Resp. Br. ("Def.-Int.'s Resp."), ECF No. 44.

      Also pending are Romp's motion for a preliminary injunction filed in the member

case,[4] *see* Partial Consent Mot. for Prelim. Inj. to Enjoin the Liquidation of Certain

Entries ("Consol. Pl.'s Mot. Prelim. Inj."), ECF No. 11 (Ct. No. 20-80), and the

Government's motion to dismiss count two of Romp's complaint, *see* Def.'s Resp. in

Partial Opp'n to Pl.'s Mot. for Prelim. Inj. and Partial Mot. to Dismiss ("Def.'s Mot.

---

[3] PrimeSource is a U.S. importer.  *See* Am. Consent Mot. to Intervene as of Right, ECF No. 27.
[4] For ease of reference, the court will include the designation "(Ct. No. 20-80)" when citing to documents filed in the member case, *Romp Coil Nails Industries Inc. v. United States*, Court No. 20-cv-00080 (CIT).

Dismiss"), ECF No. 22 (Ct. No. 20-80).  Romp seeks to enjoin liquidation "pending a final and conclusive court decision in the appeal of [Commerce's] original antidumping duty investigation of certain steel nails from Taiwan."  Consol. Pl.'s Mot. Prelim. Inj. at 1 (citing *Mid Continent Steel & Wire, Inc. v. United States*, Court No. 15-cv-00213 (CIT) ("*Mid Continent Litigation*")).  The Government consented to an injunction pending a final and conclusive decision in the instant action and otherwise opposed the requested duration.  *Id.*; *see also* Def.'s Mot. Dismiss. at 1–2, 5–9.  The Government requests the court to dismiss count two of Romp's complaint for failure to state a claim upon which relief may be granted pursuant to CIT Rule 12(b)(6) in the event the court denies Romp's request for preliminary relief.  *Id.* at 10.

For the reasons discussed herein, the court sustains the *Final Results*, denies Romp's request for preliminary relief coextensive with the *Mid Continent Litigation*, and dismisses count two of Romp's complaint.

## BACKGROUND

On May 20, 2015, Commerce published its final determination in an antidumping duty investigation of certain steel nails from Taiwan.  *See Certain Steel Nails From Taiwan*, 80 Fed. Reg. 28,959 (Dep't Commerce May 20, 2015) (final determination of sales at less than fair value).  On July 13, 2015, Commerce issued an order imposing antidumping duties on certain steel nails from Taiwan.  *See Certain Steel Nails From the Republic of Korea, Malaysia, the Sultanate of Oman, Taiwan, and the Socialist Republic of Vietnam*, 80 Fed. Reg. 39,994, 39,995–96 (Dep't Commerce July 13, 2015) (antidumping duty orders) ("*ADD Order*").

Mid Continent and several Taiwanese plaintiffs—not including Romp—commenced actions challenging Commerce's final affirmative determination. *See generally Mid Continent Steel & Wire, Inc. v. United States*, 44 CIT __, __, 427 F. Supp. 3d 1375, 1379–80 (2020) (reviewing the extensive history of the *Mid Continent Litigation*).

In September 2018, Commerce initiated AR3. *Initiation of Antidumping and Countervailing Duty Admin. Reviews*, 83 Fed. Reg. 45,596 (Dep't Commerce Sept. 10, 2018). The period of review ("POR") was July 1, 2017, to June 30, 2018. *Id*. at 45,600. Commerce selected Liang Chyuan Industrial Co. Ltd. ("Liang Chyuan"), PT Enterprise Inc. and its affiliated producer Pro-Team Coil Nail Enterprise Inc (together, "PT"), and Unicatch as mandatory respondents in the review. Respondent Selection Mem. (Nov. 7, 2018), CR 5, PR 31, CJA Tab 3.

On September 12, 2019, Commerce published its preliminary results. *Certain Steel Nails From Taiwan*, 84 Fed. Reg. 48,116 (Dep't Commerce Sept. 12, 2019) (prelim. results of antidumping duty admin. review; 2017-2018) ("*Prelim. Results*"), and accompanying Decision Mem. for Prelim. Results of Antidumping Duty Admin. Review (Sept. 5, 2019) ("Prelim. Mem."), PR 189, CJA Tab 9.

Commerce issued the *Final Results* on March 13, 2020. For the *Final Results*, Commerce calculated company-specific dumping margins for Liang Chyuan, PT, and Unicatch in the amounts of 2.54 percent, 6.72 percent, and 27.69 percent, respectively. 85 Fed. Reg. at 14,636. Commerce also established an all-others rate of 12.90 percent. *Id*. at 14,636 & n.10. This appeal followed.

Consol. Court No. 20-00079                                                              Page 7

On May 13, 2020, Romp filed its partial consent motion for a preliminary injunction to enjoin the liquidation of its entries subject to the administrative review. Consol. Pl.'s Mot. Prelim. Inj.  On June 3, 2020, the Government opposed the motion in part and further moved to dismiss count two of Romp's complaint.  Def.'s Mot. Dismiss at 10; *see also* Compl. ¶ 14, ECF No. 10 (Ct. No. 20-80) (count two of Romp's complaint, which asserts that the court should "permit the injunction" of Romp's entries pending resolution of the *Mid Continent Litigation*).  On June 5, 2020, the court held a telephone conference during which the court indicated that it would entertain a consent motion for a statutory injunction consistent with the Government's partial consent to Romp's request and later convert Romp's motion to a motion to amend the statutory injunction.  *See* Docket Entry, ECF No. 23.  Later that day, the court granted Romp's consent request for a statutory injunction enjoining the liquidation of Romp's entries pending a final and conclusive decision in this case.  Order for Statutory Inj. Upon Consent (June 5, 2020) ("Statutory Inj."), ECF No. 26 (Ct. No. 20-80).

On July 9, 2020, Romp filed a reply in support of its motion for a preliminary injunction and opposition to the Government's partial motion to dismiss.  *See* Mot. for Leave to File Out of Time Pl.'s [Resp.] to Def.'s Partial Mot. to Dismiss and Reply to Def.'s Mot. to Dismiss ("Consol. Pl.'s Resp. & Reply"), ECF No. 37 (Ct. No. 20-80).

On July 17, 2020, the court consolidated these actions.  *See* Order (July 17, 2020), ECF No. 33.

On July 24, 2020, the Government filed its reply in support of its partial motion to dismiss.  Def.'s Reply in Supp. of Partial Mot. to Dismiss ("Def.'s Reply Mot. Dismiss"), ECF No. 42 (Ct. No. 20-80).

### JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2018), and 28 U.S.C. § 1581(c) (2018).[5]  The court will uphold an agency determination that is supported by substantial evidence and otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).

Section 1516a(c)(2) permits the court to "enjoin the liquidation of some or all entries of merchandise covered by a [Commerce] determination . . . , upon a request by an interested party for such relief and a proper showing that the requested relief should be granted under the circumstances."  19 U.S.C. § 1516a(c)(2).  "[E]ntries, the liquidation of which was enjoined under subsection (c)(2), shall be liquidated in accordance with the final court decision in the action."  *Id.* § 1516a(e)(2).[6]

A preliminary injunction may also be granted as an exercise of the court's equitable powers, but such an "injunction is an extraordinary remedy never awarded as of right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted).

---

[5] All citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, and references to the U.S. Code are to the 2018 edition, unless otherwise stated.

[6] An injunction entered pursuant to section 1516a(c)(2), frequently referred to as a "statutory injunction," may be obtained by filing a "Form 24" with the court.  *See, e.g.*, *YC Rubber Co. (N. Am.) LLC v. United States*, 43 CIT __, __, 415 F. Supp. 3d 1240, 1242–46 (2019) (addressing a motion to modify a statutory injunction entered after the filing of a Form 24).

To obtain a preliminary injunction, a party must demonstrate "(1) likelihood of success on the merits, (2) irreparable harm absent immediate relief, (3) the balance of interests weighing in favor of relief, and (4) that the injunction serves the public interest."  *Silfab Solar, Inc. v. United States*, 892 F.3d 1340, 1345 (Fed. Cir. 2018) (citing *Winter*, 555 U.S. at 20).

A court may properly dismiss a claim pursuant to CIT Rule 12(b)(6) when the plaintiff's factual allegations, assumed to be true, are not "enough to raise a right to relief above the speculative level."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).

## DISCUSSION

### I.  Rule 56.2 Motions

An antidumping duty is "the amount by which the normal value" of the subject merchandise "exceeds the export price (or the constructed export price) for the merchandise."  19 U.S.C. § 1673.  To determine the amount of any dumping, the statute directs Commerce to make "a fair comparison . . . between the export price or constructed export price and normal value," *id.* § 1677b(a), and further directs the steps Commerce must follow in order to achieve a "fair comparison," *see Habaş Sinai Ve Tibbi Gazlar Istihsal Endüstrisi, A.Ş. v. United States*, 43 CIT __, __, 415 F. Supp. 3d 1195, 1210 (2019) (noting that "the 'fair comparison' requirement is met when normal value is calculated in accordance with the statute").  This case requires the court to consider three challenges to Commerce's determinations regarding normal value and constructed export price ("CEP"): (1) home market viability and related calculation of

certain CV profit; (2) treatment of ADD deposits in the agency's calculation of the freight

revenue cap as a component of CEP; and (3) Commerce's application of the

"transactions disregarded rule" to certain steel wire rod prices paid to an affiliated

supplier and the resulting adjustment to Unicatch's total cost of manufacturing.  Each

issue is discussed, in turn.

### A.  Home Market Viability and CV Profit

#### 1.  Relevant Background

Generally, normal value is the "price at which the foreign like product is first sold

. . . for consumption in the exporting country, in the usual commercial quantities and in

the ordinary course of trade and, to the extent practicable, at the same level of trade as

the export price or constructed export price."  19 U.S.C. § 1677b(a)(1)(B)(i).  "Thus,

[while] the starting point for determining normal value is home market sales," *Itochu*

*Bldg. Prods., Co. v. United States*, 41 CIT __, __, 208 F. Supp. 3d 1377, 1385 (2017),

there may be instances when Commerce must rely on other bases.  Commerce's

decision whether to use sales in the home market as the basis for normal value,

referred to as "home market viability," is generally made early in the proceeding.  *See*

*Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,358 (Dep't

Commerce May 19, 1997) (final rule) (explaining that, while Commerce "should strive to

make viability determinations early in an investigation or review[,] . . . there may be

instances in which [Commerce] must delay or reconsider a decision on viability");

Uruguay Round Agreements Act ("URAA"), Statement of Administrative Action ("SAA"),

H.R. Doc. No. 103–316, vol.1, at 821 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040,

4162 (recognizing the need for a "clear standard" because "Commerce must determine whether the home market is viable at an early stage in each proceeding to inform exporters which sales to report").[7]

     To determine home market viability, Commerce compares "the aggregate quantity . . . of the foreign like product sold in the exporting country" to "the aggregate quantity . . . of sales of the subject merchandise to the United States."  19 U.S.C. § 1677b(a)(1)(C).  The aggregate quantity of home market sales is considered "insufficient to permit a proper comparison with the sales of the subject merchandise to the United States," *id.* § 1677b(a)(1)(C)(ii), when "such quantity is less than 5 percent of the aggregate quantity . . . of sales of the subject merchandise to the United States."  *Id.* § 1677b(a)(1)(C); *cf.* 19 C.F.R. § 351.404(b)(2) (home market is viable when there are "[five] percent or more of the aggregate quantity . . . of its sales of the subject merchandise to the United States").  When the home market is not viable, normal value may be based on third country sales, 19 U.S.C. § 1677b(a)(1)(B)(ii), or constructed value, *id.* § 1677b(a)(4).[8]

     "Sales outside the ordinary course of trade are excluded from normal value." *Saha Thai Steel Pipe Pub. Co. v. United States*, 44 CIT __, __, 487 F. Supp. 3d 1323, 1328 (2020).  Thus, when calculating normal value using home market sales, the statute further directs Commerce to disregard such sales when the agency "has

---

[7] The SAA is the authoritative interpretation of the statute.  19 U.S.C. § 3512(d).
[8] Constructed value consists of the cost of production, selling, general, and administrative expenses, profit, and expenses incidental to preparing the subject merchandise for export to the United States.  19 U.S.C. § 1677b(e).

reasonable grounds to believe or suspect" that those sales "have been made at prices which represent less than the cost of production."  19 U.S.C. § 1677b(b)(1); *see also id.* § 1677(15) (defining "outside the ordinary course of trade" to include "[s]ales disregarded under section 1677b(b)(1)").  "Whenever such sales are disregarded, normal value shall be based on the remaining sales of the foreign like product in the ordinary course of trade."  *Id.* § 1677b(b)(1).  When, however, "no sales made in the ordinary course of trade remain, the normal value shall be based on the constructed value of the merchandise."  *Id.*;[9] *see also Antidumping Duties; Countervailing Duties*, 61 Fed. Reg. 7,308, 7,337 (Dep't Commerce Feb. 27, 1996) (notice of proposed rulemaking and request for Public Comments) (noting that, following enactment of the URAA, Commerce "is required to use *any* existing above-cost sales to compute normal value if such sales were made in the ordinary course of trade") (emphasis added).

When Commerce calculates normal value using constructed value, the statute directs Commerce to utilize "the actual amounts incurred and realized . . . for selling, general, and administrative expenses, and for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country."  19 U.S.C. § 1677b(e)(2)(A); *see also Mid Continent Steel & Wire, Inc.*

---

[9] Prior to the URAA, section 1677b(b)(1) directed Commerce to assess whether the remaining above-cost sales were adequate as a basis for normal value (then termed "foreign market value").  *See* 19 U.S.C. § 1677b(b) (1988).  Importantly, the URAA revised section 1677b(b)(1) to direct "Commerce to use above-cost sales if they exist" and "are otherwise in the ordinary course of trade, and to use constructed value "[o]nly if there are *no* above-cost sales in the ordinary course of trade."  SAA at 833, *reprinted in* 1994 U.S.C.C.A.N. at 4170–71.  This change was further reflected in Commerce's regulations.

*v. United States*, 941 F.3d 530, 535 (Fed. Cir. 2019) ("*Mid Continent (Oman)*")[10]

(referring to subsection (e)(2)(A) as the "preferred method"). If, however, "actual data

are not available," 19 U.S.C. § 1677b(e)(2)(B), the statute identifies three "alternative

methods" for Commerce to use, *Mid Continent (Oman)*, 941 F.3d at 535.

 In the underlying proceeding, Commerce concluded that Unicatch's home market

was viable for purposes of calculating normal value because "the total aggregate

quantity of Unicatch's home market sales of subject merchandise during the PO[R] is

greater than five percent of the aggregate quantity of its U.S. sales of subject

merchandise during the PO[R]." I&D Mem. at 17.[11] Commerce rejected Unicatch's

argument that the agency should reconsider home market viability after many of its

home market sales failed the sales-below-cost test. *Id.* at 16–18. Commerce reasoned

that 19 C.F.R. § 351.404(b) directs Commerce to consider home market sales in the

aggregate and does not direct Commerce to "only consider those home market sales

deemed to have been made in the ordinary course of trade." *Id.* at 17. Commerce

rejected Unicatch's argument that a failure to reconsider home market viability resulted

in an "absurdly high" margin. *Id.* at 18. Commerce explained that it applied standard

---

[10] *Mid Continent (Oman)* addresses challenges to Commerce's antidumping finding with respect to certain steels nails from Oman and is distinct from the *Mid Continent Litigation* referenced herein.

[11] No party disputes that Unicatch's home market sales exceed the five percent threshold when the home market sales include below cost sales. The relevant proprietary numbers may be found in Commerce's memorandum titled Final Results Margin Calculation for [Unicatch] (Mar. 10, 2020) ("Final Calc. Mem.") at 1 (U.S. quantity), Attach. 1 at ECF p. 75 (home market quantity), CR 310, PR 222, Suppl. CJA Ex. 2.

methodologies and used Unicatch's information to calculate the margin, the

reasonableness of which does not depend on rates obtained in prior segments of the

proceeding. *Id.* Pursuant thereto, Commerce relied on Unicatch's above-cost home

market sales to calculate normal value for most of Unicatch's sales and to calculate CV

profit. The CV profit was included in the constructed value used as normal value for the

few sales for which Commerce was unable to identify identical or similar model

matches. *See id.* at 17–19.

### 2. Parties' Contentions

Unicatch contends that Commerce should have used constructed value rather

than a small number of above-cost home market sales to determine normal value. Pls.'

Mem. at 15. Unicatch asserts that the statute can reasonably be interpreted to require

Commerce to either exclude below-cost home market sales *before* determining home

market viability or rely on constructed value "when the home market sales quantity in a

particular CONNUM is five percent or less than the quantity of U.S. sales in that

CONNUM." *Id.* While Unicatch concedes that Commerce's methodology "may be

reasonable in the majority of proceedings," *id.* at 16, Unicatch contends that

Commerce's reliance on its usual methodology was unreasonable in this case, *id.* at

16–24 (discussing, *inter alia*, *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716

F.3d 1370, 1378 (Fed. Cir. 2013), and *Mid Continent (Oman)*, 941 F.3d at 538–39).

Romp advances substantially similar arguments to support its contention that

Commerce should not have used Unicatch's above-cost home market sales to calculate

CV profit. *See* Consol. Pl.'s Mem. at 2–6.

The Government contends that Commerce's interpretation of the statute is consistent with both congressional intent, Def.'s Resp. at 10 (citing SAA at 821–22, 833, *reprinted in* 1994 U.S.C.C.A.N. at 4161–62, 4170–71), and Commerce's regulations, *id.* at 11 (citing 19 C.F.R. § 351.404(b)).  The Government further contends that Unicatch has not pointed to any evidence indicating that the home market sales used for comparison purposes were aberrational or otherwise made outside the ordinary course of trade.  *Id.* at 13–15.

Mid Continent contends that section 1677b(a)(1)(C) plainly requires Commerce to "examine 'the *aggregate quantity* . . .' of a respondent's home market sales when evaluating" home market viability, Def.-Int.'s Resp. at 2 (emphasis added), and parallels the requirement for Commerce to make its viability determination early in the proceeding so that "exporters [know] which sales to report," *id.* at 3 (quoting SAA at 821, *reprinted in* 1994 U.S.C.C.A.N. at 4162).

### 3.  Analysis

Unicatch acknowledges that its aggregate POR home market sales met the requisite threshold for its home market to be considered viable.  Pls.' Mem. at 10. Unicatch also acknowledges that some home market sales survived the cost test.  *Id.* Unicatch contends, however, that Commerce's use of Unicatch's above-cost home market sales to calculate normal value failed to "reach the commercially realistic result required by law" and, thus, Commerce should have used a different methodology.  *Id.* at 15.  Unicatch is mistaken.

The statute permits Commerce to disregard sales below cost and to calculate normal value using "the remaining sales . . . in the ordinary course of trade." 19 U.S.C. § 1677b(b)(1)(B). While the pre-URAA statute required Commerce to consider the adequacy of the remaining home market sales, Congress removed that requirement with the passage of the URAA such that Commerce must now "use above-cost sales if they exist" and "are otherwise in the ordinary course of trade." SAA at 833, *reprinted in* 1994 U.S.C.C.A.N. at 4170. Unicatch does not argue that its remaining home market sales were outside the ordinary course of trade; rather, Unicatch argues that its above-cost sales that matched to U.S. sales were too few in number. *See* Pls.' Mem. at 10, 12. To the extent Unicatch requests the court to impose the pre-URAA standard on Commerce's decision-making in this regard, *see id.* at 19 ("The home market should only be used for comparison if there are sufficient home market sales in the ordinary course of trade to be compared to U.S. sales."), the court declines Unicatch's request, *see Van Buren v. United States*, 141 S. Ct. 1648, 1660–61 (2021) (rejecting a statutory interpretation that would "capture [the] very concept" that Congress removed when it amended the relevant statute because "courts must presume" that Congress "intends [its amendments] to have real and substantial effect") (quoting *Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016)).[12]

---

[12] Unicatch's reliance on *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, et al.*, 60 Fed. Reg. 10,900, 10,936 (Dep't Commerce Feb. 28, 1995) (final results of antidumping duty admin. reviews, partial termination of admin. reviews, and revocation in part of antidumping duty orders) ("*AFBs*"), is inapposite because, there, Commerce based its determination on the pre-URAA version

Unicatch's attempt to impose a "commercially realistic" test on the result of Commerce's normal value calculations also lacks merit. *See, e.g.*, Pls.' Mem. at 15. Unicatch seeks to rely on *Bestpak*, *see id.* at 16, but that case is inapposite.

*Bestpak* addressed Commerce's use of a simple average of a *de minimis* rate and a rate based on adverse facts available in a non-market economy case to determine the "separate rate" to be applied to certain companies consistent with 19 U.S.C. § 1673d(c)(5). 716 F.3d at 1377–78. While the SAA refers to the weighted average of such rates as the "expected method," it also provides that "if it results in an average that would not be reasonably reflective of potential dumping margins for non-investigated exporter or producers, Commerce may use other reasonable methods." *Id.* at 1373 (quoting SAA at 873, *reprinted in* 1994 U.S.C.C.A.N. at 4200). Although Commerce's methodology was facially reasonable, *see id.* at 1378, the *Bestpak* court concluded that the methodology was unreasonable as applied because the resulting rate was not "reasonably reflective of potential dumping" by the "non-investigated exporter[s] or producers." 716 F.3d at 1373; *see also id.* at 1378–80. Unicatch has not pointed to any requirement particular to the normal value provisions of the statute that requires Commerce to engage in such a results-driven reconsideration as Unicatch

---

of 19 U.S.C. § 1677b(b). *See* Pls.' Mem. at 19 & nn.10–11. Counsel for Unicatch are cautioned not to allow their efforts at zealous advocacy to supersede their duty of candor as officers of the court. Counsel's citation to *AFBs* to support its legal interpretation, without any disclosure that Commerce's analysis therein was based on a version of the statute substantially altered with regard to the very proposition for which Unicatch cites the decision might be perceived as misleading, notwithstanding counsel's minimal acknowledgement that the decision is "not directly on point." *Id.* at 19.

suggests.  *See* Pls.' Mem. at 15–24.  A determination "is 'accurate' if it is correct as a

mathematical and factual matter, thus supported by substantial evidence."  *Nan Ya*

*Plastics Corp. v. United States*, 810 F.3d 1333, 1344 (Fed. Cir. 2016).  Thus, when

Commerce determines normal value consistent with the statutory requirements,

Unicatch's objections that the result is higher than Unicatch's previous margins of

dumping, or simply too high, is insufficient to call that determination into question.

　　　　Unicatch's reliance on *Mid Continent (Oman)* also is misplaced.  There, the

question was whether Commerce appropriately disregarded a small volume of home

market sales for purposes of determining constructed value profit.  *See Mid Continent*

*(Oman)*, 941 F.3d at 538.  In that case, the U.S. Court of Appeals for the Federal Circuit

sustained Commerce's decision not to rely on those sales when Commerce had already

determined that the home market was not viable and was within its discretion to

consider some smaller number of home market sales to be insufficient such that "actual

data [were] not available" for purposes of section 1677b(e)(2)(B).  *Id.* at 538–39.  *Mid*

*Continent (Oman)* was, thus, dependent upon distinct statutory authority that allowed

Commerce to consider the adequacy of the non-viable volume of home market sales

and does not require Commerce to reconsider its home market viability determination in

this case.[13]

---

[13] Likewise, Romp errs in relying on *Mid Continent (Oman)* to assert that Commerce's
home market viability test should "be limited to above-cost sales only" as the appellate
court's opinion did not address the requirements of that test.  Consol. Pl.'s Mem. at 3.
Romp's argument that Commerce "arbitrarily" included below-cost sales in its analysis
of home market viability, *id.* at 4, also lacks merit because, as Romp acknowledges,

While Unicatch asserts that the circumstances of this case are "unique," Pls.'

Mem. at 21, and the resulting margin is "anomalous," Pls.' Reply at 4, and

"commercially unreasonable," *id.* at 5, at most, Unicatch points to the fact that its margin

in AR3 is higher than Unicatch's margin in the second administrative review of the *ADD*

*Order* ("AR2"), PT's margin in AR3, and Unicatch's margin when normal value is based

on constructed value, Pls.' Mem. at 18.  Unicatch relies on *Baoding Mantong Fine*

*Chemistry Co. v. United States*, 39 CIT __, __, 113 F. Supp. 3d 1332, 1333–1342

(2015), to assert that the differing margins impugn Commerce's determination, *see* Pls.'

Mem. at 17–18, but that results-driven argument is misplaced.

Unicatch relies on *Baoding* in a manner rejected by this court in *T.T. International*

*Co. v. United States*, 44 CIT __, 439 F. Supp. 3d 1370 (2020).  As explained therein, "in

*Baoding*[], the court faulted the way in which Commerce calculated the dumping margin,

including the challenged [surrogate values] for certain inputs and surrogate financial

statements . . . .  [It] did not establish a separate, 'backstop' test for high margins that

_____

Commerce's home market viability test typically relies on all sales—both above and
below cost, *see id.* at 3.
         Neither Unicatch nor Romp reference *Stupp Corp. v. United States*, a case in
which this court required Commerce to revisit its home market viability determination
after taking into consideration evidence indicating that home market sales may have
incorrectly included some sales that had been made for export.  *See* 43 CIT __, 413 F.
Supp. 3d 1326 (2019).  On remand, Commerce excluded those sales from the
aggregate home market sales figures and again found the home market to be viable,
and the court affirmed.  *See Stupp Corp. v. United States*, 44 CIT __, 435 F. Supp. 3d
1307 (2020).  That case is distinguishable from the present case because the basis for
the challenge went to an error in the initial home market viability determination.  Here,
Unicatch and Romp have failed to establish that the inclusion of below cost sales in the
initial viability determination was erroneous.

could independently require remand if found by the court to be 'commercially

impossible.'" *Id*. at 1385.  In the absence of any justified challenge to Commerce's

antidumping margin calculation, *Baoding* is of no help to Unicatch.

       Lastly, Romp argues that Commerce erred in basing CV profit on Unicatch's

above-cost sales.  Consol. Pl.'s Mem. at 4–5.  Romp's argument, however, is premised

on Romp's erroneous claim that Unicatch's home market was not viable.  *Id.*  As was

the case with Unicatch, Romp then seeks to rely on *Baoding* to complain that the rate

was "absurdly high," *id.* at 4, and "perverts the purpose of the [antidumping] statute," *id.*

at 5.  Romp's conclusory assertions are based solely on the volume of Unicatch's

above-cost sales and otherwise fails to connect its objections to any particular legal

standard beyond generalized references to accuracy.  *See id.* at 5.  The statute,

however, directs Commerce to calculate CV profit using "the actual amounts . . .

realized by the specific exporter or producer . . . in connection with the production and

sale of a foreign like product, *in the ordinary course of trade*," 19 U.S.C.

§ 1677b(e)(2)(A) (emphasis added), when such "data" are "available," *id.*

§ 1677b(e)(2)(B).  Romp does not challenge Commerce's determination that "actual

data" were "available" on sales in the "ordinary course of trade" for purposes of its

calculation of CV profit and, therefore, Romp's challenge fails.[14]

---

[14] While *Mid Continent (Oman)* sustained Commerce's determination that "actual data" were *not* "available" when the respondent lacked a viable home market, 941 F.3d at 538–40, neither the appellate court's opinion nor Commerce's statutory interpretation offered in the course of that proceeding constrain Commerce from using actual data when a respondent—such as Unicatch—has a viable home market.

Because substantial evidence supports the agency's analysis of home market viability and its decision to use home market sales as the basis for normal value is in accordance with the law, the court will sustain Commerce on this issue.  The court will also sustain Commerce's use of Unicatch's above-cost sales to calculate CV profit.[15]

## B.  Freight Revenue Cap

### 1.  Relevant Background

Section 1677a(c)(2) directs Commerce to reduce the price used to establish CEP by "the amount, if any, included in such price, attributable to any additional costs, charges, or expenses, and United States import duties, which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States."  19 U.S.C. § 1677a(c)(2)(A).  To calculate a net freight expense, "Commerce offsets [a] respondent['s] freight expenses with related freight revenues, capping those revenues at the level of the associated expenses." *ABB, Inc. v. United States*, 41 CIT __, __, 273 F. Supp. 3d 1200, 1208 (2017); *see also Dongguan Sunrise Furniture Co. v. United States*, 36 CIT __, __, 865 F. Supp. 2d 1216, 1248 (2012).  In other words, to the extent that a respondent receives freight revenue from a customer, Commerce will include that revenue in the price, up to, but no more than, the amount of freight expense.

---

[15] Commerce adequately set forth its rationale for finding Unicatch's home market to be viable and for using its preferred method to calculate CV profit.  I&D Mem. at 16–17, 18–19.  Thus, contrary to Unicatch's assertion, Pls.' Reply at 3, a remand is unnecessary for Commerce to further examine Unicatch's arguments.

Commerce does not treat antidumping duties as import duties or costs for

purposes of section 1677a(c)(2)(A).  *See, e.g.*, *Hoogovens Staal BV v. United States*,

22 CIT 139, 146, 4 F. Supp. 2d 1213, 1220 (1998).[16]  This is because antidumping

duties "are special duties that implement a trade remedy," not "normal selling expenses

[or] customs duties."  *APEX Exports v. United States*, 777 F.3d 1373, 1379 (Fed. Cir.

2015).  Antidumping duties are imposed "to prevent dumping by effectively raising the

price of subject merchandise in the U.S. to the fair value," and, as such, constitute "an

element of a fair and reasonable price."  *Id.* (quoting *Hoogovens Staal BV*, 22 CIT at

146, 4 F. Supp. 2d at 1220).

In the underlying proceeding, Unicatch reported payments received from certain

U.S. customers[17] in two fields: GRSUPRU (gross unit price) and FREIGREVU (freight

revenue).  Unicatch's CQR at 22, 33.[18]  An exhibit appended to Unicatch's

questionnaire response indicated that Unicatch included five elements in its reported

---

[16] *Hoogovens Staal BV* discusses 19 U.S.C. § 1677a(d)(2)(A) (1988), which was re-designated as subsection (c)(2)(A) as part of the statutory amendments effected by the URAA.  *See* URAA § 223 (amending 19 U.S.C. § 1677a).

[17] This issue is limited to certain CEP direct sales shipped from Unicatch in Taiwan to TC International's customers in the United States.  *See* Unicatch Sec. B, C & D Resp. (Feb. 13, 2019) ("Unicatch's BCD Resp."), ECF pp. 228–277 ("Unicatch's CQR") at 16, CR 28–53, 55, 57, 59–60, 62–71, 78, 80, 82, 84, 86–90, 92, 97–101, 112–116, 122–126, PR 67–70, CJA Tab 4 (identifying four channels of distribution, the first of which constitutes CEP direct sales); Pls.' Mem. at 24.  For such sales, Unicatch used two terms of delivery: "freight separately itemized" or "freight in price."  Unicatch's CQR at 18–19.  For sales with "freight separately itemized," Unicatch reported freight revenue in a separate field.  *Id.* at 33, Ex. C-20a.

[18] Citations to Unicatch's Section C Questionnaire Response point to the document's internal pagination or accompanying exhibits.  As noted *supra* note 17, Unicatch's Section C Questionnaire Response was filed jointly with its Section B and D Questionnaire Responses and spans ECF page numbers 228 through 277.

freight revenue for these CEP direct sales customers: (1) ocean freight; (2) U.S. inland freight, port to customer; (3) brokerage; (4) U.S. customs duty; and (5) ADD deposits. *Id.* at 33, Ex. C-20a.

For the *Preliminary Results*, Commerce capped Unicatch's freight revenue based on the sum of the four expenses deducted from U.S. price, i.e., ocean freight, U.S. inland freight, port to customer, brokerage, and U.S. customs duty.  Prelim. Determination Margin Calc. for [Unicatch] (Sept. 5, 2019) ("Prelim. Calc. Mem.") at 5, CR 267, PR 184, CJA Tab 8; Prelim. Mem. at 12–13.  Unicatch challenged Commerce's decision to exclude ADD deposits from the freight revenue cap, arguing that, in so doing, Commerce effectively removed the ADD deposits from U.S. price.  Admin. Case Br. of Unicatch and PT (Oct. 25, 2019) at 15–16, CR 295, PR 204, CJA Tab 12. Unicatch argued that, if Commerce's decision was not the result of clerical error, it constituted "a methodological mistake" that was contrary to Commerce's practice as reflected in AR2.  *Id.* at 17 (citing Issues and Decision Mem. for the Final Results of the 2016-2017 Admin. Review of the Antidumping Duty Order on Certain Steel Nails from Taiwan (Mar. 15, 2019) ("AR2 I&D Mem.") at Cmt. 9, *available at* https://enforcement. trade.gov/frn/summary/taiwan/2019-05427-1.pdf (last visited Sept. 14, 2021)).

For the *Final Results*, Commerce continued to omit Unicatch's ADD deposits from the freight revenue cap.  I&D Mem. at 20–21; *see also* Final Calc. Mem. at 3. Commerce reasoned that "each segment of a proceeding stands on its . . . record," I&D Mem. at 20 & n.105 (citation omitted), and the record for this review "does not support the assertion implied in Unicatch's arguments that [ADD deposits] are not fully captured

in the reported gross unit price." *Id.*  Commerce noted that its practice is "not to deduct [antidumping] duties from the U.S. price," and stated that excluding ADD deposits from the freight revenue cap was "consistent with [this] practice." *Id.* at 21 & n.109 (citation omitted).

### 2.  Parties' Contentions

Unicatch contends that Exhibit C-20a establishes that ADD deposits were included in its freight revenue calculation and not in gross unit price, which is consistent with Unicatch's reporting of certain CEP direct sales using the sales term "freight separately itemized."  Pls.' Mem. at 28–29.  While Unicatch agrees with Commerce's assertion that ADD deposits are not movement expenses, Unicatch contends that they constitute "revenue items" and Commerce's failure to include the payments in U.S. price amounts to a decision by Commerce to treat ADD deposits as an expense to be deducted.  *Id.*  Unicatch further contends that Commerce should have requested additional information from Unicatch pursuant to 19 U.S.C. § 1677m(d) rather than deny the adjustment.  *Id.* at 29.

The Government contends that Unicatch's arguments are premised on the unsupported assumption that "Unicatch's gross unit price does not capture the [ADD deposits]."  Def.'s Resp. at 17.  According to the Government, evidence indicating that Unicatch "also charged antidumping duties as part of freight . . . is [in]sufficient to show that antidumping duties were not part of its gross unit price" because "nothing on the record actually supports Unicatch's contention."  *Id.* at 17–18.  The Government further contends that Unicatch failed to administratively exhaust its argument that Commerce

should have requested additional information, and the argument fails on the merits

because Unicatch's section C questionnaire response did not facially demonstrate any

deficiency concerning gross unit price.  *Id.* at 18–19.  Mid Continent advances

substantially similar arguments.  Def.-Int.'s Resp. at 8–10.

In reply, Unicatch counters that the Government's exhaustion argument lacks

merit because "Unicatch reasonably assumed that Commerce's decision was a clerical

error" given its inconsistency with AR2.  Pls.' Reply at 8.

### 3.  Analysis

Unicatch's arguments on this issue unnecessarily complicate what is, in fact, a

simple factual issue regarding a favorable adjustment to U.S. price that Unicatch hoped

to obtain but which Commerce denied as unsupported by the record.  Unicatch

identifies no evidence that the agency failed to consider, and the court finds that

Commerce's treatment of freight revenue and the ADD deposits allegedly included

therein was based on substantial evidence.

To understand this issue and Commerce's analysis of it, it may help to recap the

issues upon which the parties appear to agree:

1) Unicatch charged certain U.S. customers for "freight" separate from the gross unit price for subject merchandise;
2) Commerce does not deduct ADD deposits from gross unit price when calculating antidumping margins; and
3) When a customer pays separately for freight and subject merchandise, Commerce will cap the freight revenue it recognizes by the freight expenses.

The disagreement here revolves around the ADD deposits.  Unicatch reported that

certain U.S. sales were made with the "freight separately itemized" and when it reported

the separately itemized freight revenue, it asserted that the difference between the

reported total freight revenue and the freight expenses represented customer payment

of ADD deposits that should be added to U.S. price.  *See* Unicatch's CQR at 18–19, 33,

Ex. C-20a.  In other words, Unicatch's position is that Commerce should have

recognized this additional revenue without subjecting it to the "cap" on freight revenue

based on freight expenses.  Commerce rejected that assertion as unsupported.  *See*

I&D Mem. at 20 (explaining that "there is no record evidence to support including [ADD]

deposits in a freight revenue calculation" and rejecting Unicatch's implied assertion that

ADD deposits "are not fully captured in the reported gross unit price").  In its brief to the

court, Unicatch identified no record evidence that its customers agreed to pay for ADD

deposits as part of the separately itemized freight.

        The court understands Unicatch to be arguing that by declining to recognize this

revenue as the separate payment of ADD deposits, Commerce is effectively deducting

ADD deposits from U.S. price, contrary to the statute and established judicial precedent.

*See, e.g.*, Pls.' Mem. at 30.  In other words, Unicatch believes that this alleged payment

of ADD deposits as part of the freight revenue should be added to the gross unit price

(without regard to any application of the cap on freight revenue determined by freight

expenses).  Accepting the logical soundness of Unicatch's argument for purposes of

this discussion, the argument is entirely dependent upon Unicatch having established

that "freight separately itemized" meant that freight *and ADD deposits* were separately

itemized in the freight revenue (or that freight inclusive of ADD deposits was separately

itemized).  Commerce understood this to be Unicatch's claim and determined that it was

up to Unicatch to support such a claim and that Unicatch had not.  *See* I&D Mem. at

20–21.  Thus, for sales reported as "freight separately itemized," Commerce treated the

separate revenue as freight revenue and capped that freight revenue by the amount of

freight expenses, *see* Final Calc. Mem. at 3, rejecting as unsupported Unicatch's

request for recognition of the difference as payment of ADD deposits, *see* I&D Mem. at

20.

      Having dissected the Parties' arguments, the court finds that substantial

evidence supports Commerce's application of the freight revenue cap.  Commerce

expressly found that the record "does not support the assertion implied in Unicatch's

arguments that [ADD deposits] are not fully captured in the reported gross unit price."

I&D Mem. at 20.  Before the court, Unicatch simply repeats the arguments it made to

Commerce and points to Exhibit C-20a for support.  *See* Pls.' Mem. at 24–25.  Exhibit

C-20a is a chart that Unicatch described as a worksheet showing freight revenue for

CEP direct sales.  *See* Unicatch's CQR at 33 and Ex. C-20a.  While Unicatch identified

"ADD ($)" on that chart, *id.* at Ex. C-20a, Unicatch does not identify evidence in the

administrative record that calls into question Commerce's findings that "[ADD] deposits

are not freight or other movement related expenses" and "there is no record evidence

demonstrating that [ADD] deposits are not captured in [gross unit price]."  I&D Mem. at

21.

      This situation is analogous to that faced by the court in *ABB*, in which the court

explained that "[t]he inclusion of multiple expense fields in the cap on [the respondent's]

domestic inland freight revenue would allow the revenue to offset more expenses and,

therefore, be a favorable adjustment for the respondent." 273 F. Supp. 3d at 1209.

While Unicatch does not seek to offset additional expenses with its freight revenue, it

seeks to exclude some of that revenue from the expense-based cap, thereby adding

that revenue to U.S. price, by claiming that the revenue represents the payment of ADD

deposits. *See* Unicatch's CQR at Ex. C-20a. As was the case in *ABB*, "a respondent

bears the burden of establishing its entitlement to any favorable adjustment." 273 F.

Supp. 3d at 1209 (citation omitted); *see also QVD Food Co. v. United States*, 658 F.3d

1318, 1324 (Fed. Cir. 2011) (allocating the burden of creating an adequate record to the

interested party with the information). Here, Commerce reasonably found that Unicatch

had failed to meet that burden.

        With respect to Unicatch's argument that Commerce altered its treatment of

Unicatch's freight revenue between AR2 and AR3 without explanation, Pls.' Mem. at

26–27; Pls.' Reply at 7–8, "each administrative review is a separate exercise of

Commerce's authority that allows for different conclusions based on different facts in the

record," *see, e.g.*, *Qingdao Sea–Line Trading Co. v. United States*, 766 F.3d 1378,

1387 (Fed. Cir. 2014). In AR2, for example, Commerce found that ADD deposits were

"charged to the customer" and "paid by the customer." AR2 I&D Mem. at 26 & nn.152–

53 (citations omitted). There is insufficient information on the record of this review to

allow the court to find that the records of the two administrative reviews are sufficiently

similar such that Commerce must provide further explanation for its contrary conclusion

in this review.

Finally, with respect to Unicatch's argument that Commerce failed to comply with 19 U.S.C. § 1677m(d) because it did not request additional information from Unicatch, Pls.' Mem. at 29, Unicatch failed to exhaust its administrative remedies with respect to this argument by failing to raise it before Commerce.  "[T]he Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies."  28 U.S.C. § 2637(d).  While certain exceptions to this general rule exist, none would appear to apply in this instance and Unicatch has not developed its argument in any case; consequently, the court declines to consider Unicatch's argument in the first instance.[19] Accordingly, the court will sustain Commerce on this issue.

### C. TOTCOM Adjustment

#### 1. Relevant Background

In the underlying proceeding, Unicatch informed Commerce that it purchased inputs of steel wire rod from both affiliated[20] and unaffiliated suppliers.  Unicatch's DQR

---

[19] Unicatch seeks to avoid responsibility for raising this argument before Commerce by noting its belief that Commerce's preliminary decision with respect to this issue "was a clerical error" and, when filing its administrative case brief, "Unicatch did not know, and had no reason to believe, that Commerce would adopt a directly contrary position in [AR]3" as compared to AR2.  Pls.' Reply at 8.  Commerce's preliminary memoranda were clear with respect to the agency's calculation of the freight revenue cap.  *See* Prelim. Mem. at 13; Prelim. Calc. Mem. at 5.  Unicatch's failure to raise all relevant arguments before Commerce precludes Unicatch from seeking to raise this new argument now.  *See, e.g.*, *Boomerang Tube LLC v. United States*, 856 F.3d 908, 912 (Fed. Cir. 2017) (noting that 28 U.S.C. § 2673(d) "indicates a congressional intent that, absent a strong contrary reason, the court should insist that parties exhaust their remedies before the pertinent administrative agencies") (citation omitted).

[20] The two affiliated suppliers are identified in Unicatch's questionnaire response and referred to as "Supplier X" and "Supplier Y."  Unicatch's BCD Resp., ECF pp. 278–319 ("Unicatch's DQR") at 9, Ex. D-5.  Their respective identities are not relevant to this litigation.

at 9, Ex. D-5; Unicatch Resp. to Sec. D Suppl. Questionnaire (July 17, 2019)

("Unicatch's SDQR") at Ex. SD-3, CR 234–39, PR 168, CJA Tab 7 (revising Exhibit D-

5).  Unicatch provided the weighted-average purchase price for each affiliated supplier

as well as a single average price for all unaffiliated suppliers combined.  Unicatch's

SDQR at Ex. SD-3.[21]  Commerce asked Unicatch to "provide evidence that Unicatch

paid market prices for all purchases from [Supplier X]."  *Id.* at 3.  Unicatch pointed to

invoices it claimed demonstrated that Supplier X purchased the steel wire rod inputs

from companies unaffiliated with Unicatch and resold those inputs to Unicatch at higher

prices.  *Id.* (citing *id.* at Ex. SD-4).

Commerce has discretion to disregard transactions between affiliated entities

when calculating cost of production "if, in the case of any element of value required to

be considered, the amount representing that element does not fairly reflect the amount

usually reflected in sales of merchandise under consideration in the market under

consideration."  19 U.S.C. § 1677b(f)(2).  For purposes of section 1677b(f)(2),

Commerce's "preference is to compare the transfer price paid by the respondent to

affiliated parties for production inputs to the price paid to unaffiliated suppliers."  Issues

and Decision Mem. for the Antidumping Duty Admin. Review of Polyethylene Retail

Carrier Bags from Thailand (Jan. 17, 2007) ("PRCB from Thailand 2007 Mem.") at 18,

*available at* https://enforcement.trade.gov/frn/summary/thailand/E7-552-1.pdf (last

visited Sept. 14, 2021).  When Commerce finds that prices between affiliates are for

---

[21] Supplier X's average price was below that of the unaffiliated suppliers whereas
Supplier Y's average price was above that of the unaffiliated suppliers.  *Id.*

less than fair market value, Commerce makes an upward adjustment to the

respondent's cost data to so that the price paid for the input reflects a market price.

*See id.*

For the *Preliminary Results*, Commerce increased Unicatch's costs to account for

purchases from Supplier X at less than market value.  Prelim. Calc. Mem. at 3, Attach.

3.  Unicatch argued to the agency that Exhibit SD-3 demonstrates that the combined

weighted-average purchase price paid to both Supplier X and Supplier Y "was higher

than the weighted average price paid to the unaffiliated suppliers" and Commerce

should have analyzed the affiliated suppliers in the aggregate.  Admin. Rebuttal Br. of

Unicatch and PT (Nov. 1, 2019) at 3, CR 298, PR 212, Suppl. CJA Ex. 1.  Unicatch

further argued that if Commerce continued to "reject the lower of the two purchase

prices paid to one affiliate, it should also reject the higher of the two purchase prices

paid to the other affiliate."  *Id.* at 4.

Commerce disagreed.  I&D Mem. at 26–27.  Commerce explained that its

"practice [is] to analyze the input transfer price from each supplier individually, not as a

weight average from all affiliated suppliers."  *Id.* at 26 & n.129 (citation omitted).

Because Commerce concluded that its adjustment was consistent with this practice, it

made no changes for the *Final Results* except to correct clerical errors.  *Id.* at 27.[22]

---

[22] For the *Preliminary Results*, Commerce adjusted Unicatch's costs based on the
combined weighted-average price from affiliated and unaffiliated suppliers.  Prelim.
Calc. Mem., Attach. 3.  For the *Final Results*, the adjustment was based on the
weighted-average price from unaffiliated suppliers alone.  Final Calc. Mem., Attach. 3.

### 2. Parties' Contentions

Unicatch contends that Commerce acted unreasonably in disregarding certain transactions because the combined weighted-average purchase price from the two affiliates was higher than Unicatch's purchase price from its unaffiliated suppliers.  Pls.' Mem. at 32–34; Pls.' Reply at 8–9.  Unicatch also contends that Commerce erred in disregarding certain transfer prices paid to Supplier X because Unicatch provided evidence demonstrating that the prices Unicatch paid to Supplier X were higher than the prices Supplier X paid its unaffiliated suppliers for the inputs.  Pls.' Mem. at 31–32 (citing Unicatch's SDQR at 3, Ex. SD-4); *see also* Pls.' Reply at 9.  Unicatch contends that Commerce's determination in OCTG from Mexico 2006[23] supports Unicatch's position because there, Commerce compared the purchase price between affiliates to the price the affiliate paid its unaffiliated suppliers.  Pls.' Mem. at 32.  Lastly, Unicatch contends that Commerce should have excluded above-market prices.  Pls.' Reply at 9.

The Government contends that Commerce's "practice is to analyze the transfer prices of the input for each affiliated supplier individually."  Def.'s Resp. at 21 (cataloguing Commerce determinations).  The Government also contends that Unicatch's focus on the resale value of the input is misplaced because "Commerce

---

[23] Unicatch refers to this determination as "*2016 Mexico OCTG*" but cites to the Federal Register notice accompanying the 2006 decision memorandum.  *See* Pls.' Mem. at 32 n.21 (citing *Certain Oil Country Tubular Goods from Mexico*, 71 Fed. Reg. 54,614 (Dep't Commerce Sep. 18, 2006) (notice of final results and partial rescission of antidumping duty admin. review)).

prefers to determine market value using the price the respondent is willing to pay its unaffiliated supplier for the same input."  *Id.* at 22 (citation omitted).

Mid Continent adds that comparing "the weighted-average transfer price from all affiliated parties against the market price . . . would allow individual affiliated parties whose transfer price is below the market price to escape scrutiny" when, as here, "the weighted-average transfer price is above the market price."  Def.-Int.'s Resp. at 12.

### 3.  Analysis

Unicatch takes issue with Commerce's reliance on the purchase price from individual affiliates rather than the combined weighted average to determine whether such prices are above market price.  Pls.' Mem. at 31–32; Pls.' Reply at 8.  When a respondent purchases inputs or services from more than one affiliate, however, Commerce may reasonably decide to examine each affiliate individually.  The statute vests Commerce with discretion to determine how best to apply the transactions disregarded rule, *see* 19 U.S.C. § 1677b(f)(2), and Unicatch does not argue that Commerce's methodology represents an impermissible construction of the statutory terms.  At most, Unicatch asserts that Commerce used the weighted-average purchase price from both affiliates in AR2 and therefore acted unreasonably in declining to do so in AR3.  Pls.' Mem. at 31–34.  The relevant parts of the AR2 record are not on the record of this review, however, and the issue was not presented to Commerce in that segment of the proceeding for the agency to explain its determination.  *See generally* AR2 I&D Mem.  Without any basis for comparing Commerce's purportedly inconsistent decisions, the court finds no reason to remand the issue in this proceeding.

Accordingly, Commerce's decision to compare each affiliate's price to the market price
is in accordance with the law.

Unicatch also takes issue with Commerce's reliance on the weighted-average
purchase price from Unicatch's unaffiliated suppliers instead of the affiliated supplier's
acquisition cost as the basis for market price.  Pls.' Mem. at 33–34; Pls.' Reply at 8.  "In
establishing the market price," however, Commerce's preference "is to use the price
paid by the respondent itself in transactions with unaffiliated suppliers" involving
identical products when such information is available "because this price best
represents the respondent's own experience in the market under consideration."  PRCB
from Thailand 2007 Mem. at 18; *cf. Mid Continent Steel & Wire, Inc. v. United States*, 41
CIT __, __, 219 F. Supp. 3d 1326, 1349 (2017) (sustaining Commerce's disregard of
certain transactions for services performed by affiliated tollers based on a comparison to
the average market prices for services performed by unaffiliated tollers); *cf.* Issues and
Decision Mem. for the Antidumping Duty Investigation of Large Residential Washers
from Mexico (Dec. 18, 2012) at 12, *available at* https://enforcement.trade.gov/frn
/summary/mexico/2012-31077.txt (last visited Sept. 14, 2021) (using the affiliates' cost
of production to determine market value when the respondent purchased no relevant
services from unaffiliated suppliers and the affiliates did not sell to "other outside
parties").

While in OCTG from Mexico 2006 Commerce used "the affiliated resellers'
acquisition cost from an unaffiliated party, plus selling, general, and administrative
costs, and financial costs," as the baseline for comparison to the transfer price to the

respondent, OCTG from Mexico 2006 Mem. at 13, in that case, the respondent had

argued that its input purchases "from unaffiliated suppliers [were] not comparable [to its

affiliated party] transactions" and the petitioner had failed to timely raise the issue for

Commerce to further investigate, *id.* at 11.  Unicatch does not argue that its steel wire

rod purchases from unaffiliated suppliers are unsuitable as a basis for testing the

affiliated party price.  *See* Pls.' Mem. at 30–33; Pls.' Reply at 8–9.  Thus, Commerce's

decision to use the weighted-average price paid to Unicatch's unaffiliated suppliers as

the market price is supported by substantial evidence and in accordance with the law.

Lastly, Unicatch offers no support for its contention that Commerce was required

to also exclude above-market prices.  *See* Pls.' Reply at 9.  Even if the statute might

reasonably be interpreted to permit such an adjustment, it certainly does not require it.

Accordingly, the court will sustain Commerce's cost of manufacturing adjustment.

## II.  Romp's Motion for a Preliminary Injunction and the Government's Partial Motion to Dismiss

### A.  Parties' Contentions

Romp seeks to extend the duration of the statutory injunction the court entered in

this case until a final and conclusive court decision in the *Mid Continent Litigation*.

Consol. Pl.'s Mot. Prelim. Inj. at 1, 6–7.  Romp contends that an extension is merited

because Romp has demonstrated that the four criteria for a preliminary injunction are

satisfied.  *Id.* at 3.

The Government contends that Romp is not entitled to the requested duration of

its injunction because Romp "failed to participate in the investigation litigation" and,

thus, "failed to preserve its right to an injunction" pending a final and conclusive court decision in that action.  Def.'s Mot. Dismiss at 5–6; *see also id.* at 7 (discussing *Capella Sales & Servs. Ltd. v. United States*, 40 CIT __, 180 F. Supp. 3d 1293 (2016), *aff'd* 878 F.3d 1329 (Fed. Cir. 2018), and *Capella Sales & Servs. Ltd. v. United States*, 40 CIT __, __,181 F. Supp. 3d 1255, 1263–64 (2016), *aff'd* 878 F.3d 1329 (Fed. Cir. 2018)). The Government also contends that Romp has failed to demonstrate fulfillment of each criteria necessary for a preliminary injunction.  *Id.* at 9–10.  "Because Romp is not entitled to an injunction for the duration of the investigation litigation," the Government contends, "it has failed to state a claim on which relief can be granted with regard [to] count two of its complaint" and the court should dismiss that count.  *Id.* at 10; *see also* Def.'s Reply Mot. Dismiss at 1–2 (asserting that Romp does not contest dismissal of count two if the court declines to extend the duration of the injunction).

   **B.  Analysis**

   Pursuant to the statutory injunction entered on June 5, 2020, Romp's entries subject to AR3 "shall be liquidated in accordance with the final court decision in the action," including all appeals.  19 U.S.C. § 1516a(e); *see also* Statutory Inj. at 3; *Yancheng Baolong Biochem. Prods. Co. v. United States*, 406 F.3d 1377, 1381 (Fed. Cir. 2005) (discussing the meaning of "final court decision in the action" for purposes of section 1516a(e)).  The question presented in this case is whether the court should use its equitable powers to extend the duration of the injunction through a final and conclusive decision in the *Mid Continent Litigation*.  As discussed below, the answer to that question is "no."

To obtain a preliminary injunction, a plaintiff must show that it is likely to succeed on the merits of its claim.  *Silfab Solar*, 892 F.3d at 1345.  Romp seeks to fulfill the "likelihood of success on the merits" criterion by pointing to the "serious question of law" Romp raises with respect to its challenges to the *Final Results*.  Consol. Pl.'s Mot. Prelim. Inj. at 5.  Setting aside the question whether "sliding-scale jurisprudence remains good law after *Winter*," *Silfab Solar*, 892 F.3d at 1345 (declining to address whether "a lesser showing of likelihood of success is acceptable" when "there is a significant showing of irreparable injury"), Romp's focus on the likelihood that it will succeed in this case is misplaced for two reasons: (1) the statutory injunction Romp obtained preserves Romp's right to liquidation in accordance with a final court decision concerning AR3, *see* 19 U.S.C. § 1516a(e); Statutory Inj. at 3; and (2) with the issuance of the court's decision rejecting Romp's present claims, its likelihood of success is clearly diminished.

Romp also offers no arguments or authority supporting the court's consideration of the likelihood that other plaintiffs will succeed in obtaining revocation of the *ADD Order* in the *Mid Continent Litigation,* in which Romp elected not to participate, to determine whether to grant preliminary relief in this case.  Moreover, Romp has not addressed why those plaintiffs are likely to succeed, particularly when the court recently upheld Commerce's remand redetermination maintaining an above-*de minimis* margin for PT, a mandatory respondent in the investigation, thereby leaving the *ADD Order* in place.  *See Mid Continent Steel & Wire, Inc. v. United States*, 45 CIT __, 495 F. Supp. 3d 1298 (2021), *appeal docketed*, No. 21-1747 (Fed. Cir. Mar. 17, 2021).  While the

appeal is ongoing, Romp's failure to address this aspect of its motion defeats its request.  *See Silfab Solar*, 892 F.3d at 1345 (preliminary relief is improper when the movant does not demonstrate any probability of success).

In sum, Romp has failed to establish a likelihood of success on the merits; thus, the court need not address the other criteria for a preliminary injunction.  Romp's motion for a preliminary injunction, construed as a motion to modify the statutory injunction, will be denied, and the court will dismiss count two of Romp's complaint.

### CONCLUSION AND ORDER

In accordance with the foregoing, it is hereby

**ORDERED** that Commerce's *Final Results* are sustained; it is further

**ORDERED** that Romp's motion for a preliminary injunction, construed as a motion to modify the statutory injunction (ECF No. 11 (Ct. No. 20-80)), is **DENIED**; and it is further

**ORDERED** that count two of Romp's complaint (ECF No. 10 (Ct. No. 20-80)) is **DISMISSED**.

Judgment will be entered accordingly.


                                                          /s/      Mark A. Barnett
                                                          Mark A. Barnett, Chief Judge

Dated: September 14, 2021
          New York, New York